UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FRANKLIN BROWNING, individually and on behalf of all other persons similarly situated who were employed by CEVA FREIGHT, LLC and EGL, INC.; and/or any other entities affiliated with, controlling, or controlled by CEVA FREIGHT, LLC, or EGL, Inc.,

Index No. 2:10-cv-05594-ADS-AKT

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS OF DEFENDANTS CEVA FREIGHT, LLC AND EGL, INC.**

Plaintiffs,

-against-

CEVA FREIGHT, LLC; and EGL, INC.,

Defendants.

---

Pursuant to Local Rule 56.1, CEVA Freight, LLC and EGL, Inc. respectfully submit the following statement of material facts:

**Introduction And Factual Overview**

1.      Four of the five plaintiffs who have filed consent forms in this action—Andrew Huggins ("Huggins"), Franklin Browning ("Browning"), Trevor Halls and Winston James ("James") (hereinafter the "Plaintiffs")—provided pick-up and delivery services to CEVA Freight, LLC, pursuant to Agreements for Leased Equipment and Independent Contractor Services (collectively, the "Agreements") with CEVA Freight, LLC (and/or predecessor or affiliated entities Eagle Freight Services, Inc., and/or EGL Eagle Global Logistics, LP).[1] (CEVA00003827-44, CEVA00000175-253, CEVA00012392-408, CEVA00003845-881, CEVA00003808-26.)  The fifth plaintiff, Hugh Halls, did not execute an agreement with CEVA, but rather, provided services to CEVA pursuant to Agreements executed by plaintiff Trevor

---

[1] For the sake of simplicity, and for the limited purpose of this statement, the term "CEVA" as used herein refers to each of these three entities, individually and collectively, unless a distinction between them is otherwise noted.

Halls, in his capacity as the President and CEO of Halls Trucking Corporation, the corporation that both of the Halls co-owned.  (HA00476; H. Halls Dep. at 86, 113-14; T. Halls Dep. at 44.)

2.       Both before and after providing pick-up and delivery services to CEVA, all five of the plaintiffs who have filed consent forms in this action had experience in the trucking industry providing pick-up and delivery services to multiple companies utilizing vehicles that the plaintiffs owned.  (*See*, *e.g.*, A. Huggins Dep. at 25-27, 41, 61, 307; F. Browning Dep. at 30-31, 41, 45-46, 90, 147, 220-22; T. Halls Dep. at 20, 30-31, 41; H. Halls Dep. at 36, 39-40, 184; W. James Dep. at 42-43, 81, 84, 304, 306-07.)

3.       The vehicles that all of the plaintiffs and/or their corporations used to provide services to CEVA were the same vehicles that they used to provide pick-up and delivery services to other companies.  (A. Huggins Dep. at 61, 177, 307; F. Browning Dep. at 222; H. Halls Dep. at 63, 184; T. Halls Dep. at 160; W. James Dep. at 83-84, 142, 304, 306-07.)

4.       CEVA did not pay the Plaintiffs based on the amount of time that they worked, but rather, paid them a fee per pick-up or delivery based on a payment rate set forth in the Agreements, which could be changed from time to time by mutual agreement of the parties. (Agreements § 4.01, App. III.)  CEVA did not provide any other compensation or benefits to Plaintiffs.  (*Id.* § I.)

5.       CEVA did not withhold taxes from the compensation paid to the Plaintiffs, but rather, issued IRS Form 1099s to them at year end.  (CEVA00015435-15445, CEVA00017343-17348, CEVA00017350-17355, CEVA00017356-17363.)  The Plaintiffs were solely responsible for filing local, state, provincial, and federal income tax returns related to their earnings. (Agreements § 4.09.)

6.     The testimony, Schedule C "Profit or Loss From Business (Sole Proprietorship)" forms and/or U.S. Corporation Income Tax Returns of the Plaintiffs and/or their corporations reflect that they regularly took significant tax deductions for expenses incurred providing services to CEVA.  (*See*, *e.g.*, B00172, B00200, HA00361, HA00398, WJ1872, WJ1914; A. Huggins Dep. at 212, 214-15.)

### The Agreements Pursuant To Which The Plaintiffs Provided Services To CEVA Established Independent Contractor Relationships Between The Parties

7.     The provisions of each of the Agreements established the parties' respective rights governing their business relationships.  (*See generally* Agreements.)

8.     Under the Agreements, the Plaintiffs agreed to lease vehicles that they owned to CEVA and to provide pick-up and delivery services to CEVA using those vehicles in exchange for payment on a per pick-up or delivery basis.  (Agreements §§ I, 2.01, 2.02, App. III.)

9.     The Agreements explicitly created independent contractor relationships between the Plaintiffs and CEVA.  (*Id.* §§ I, 2.03.)  In addition, the Plaintiffs acknowledged in the Agreements that neither they nor their employees or agents would be considered employees of CEVA, and that nothing in the Agreements would be construed to create an employment relationship between the Plaintiffs and CEVA.  (*Id.* § I.)

10.     The Agreements explicitly gave the Plaintiffs the freedom to exercise independent discretion and judgment as to the method, manner and means of performance of their contractual obligations in all respects, including, but not limited to, such matters as the rejection and acceptance of dispatches, the days and time that they would operate their vehicles, the routes traveled for pick-up and delivery dispatches, and the repair of their vehicles.  (*Id.* §§ I., 2.02.)

11.     The Agreements also explicitly provided that Plaintiffs would direct the operation of the vehicles that they were leasing to CEVA, and that CEVA did not have any right to control

the vehicles that it was leasing from the Plaintiffs or the Plaintiffs' drivers.  (*Id.* at § 2.02.)

12.     Plaintiffs acknowledged, however, that CEVA would issue reasonable and lawful instructions regarding the results that Plaintiffs were to accomplish under the Agreements, such as meeting time-sensitive service parameters, when required by CEVA customers.  (*Id.* § I.)

13.     Under the Agreements, Plaintiffs had the freedom to decline any dispatch that CEVA offered to them without penalty, provided that they had not already advised CEVA that they would accept that dispatch.  (*Id.* § 2.02; R. Bateman Dep. at 71-72.)  CEVA trains its employee dispatchers annually to ensure that they understand and uphold the rights of independent contractor drivers to refuse any work without penalty.  (R. Bateman Dep. at 73-74.)

14.     The Agreements also gave Plaintiffs the freedom to hire others to perform, or assist them in performing, their contractual obligations under the Agreements.  Each Agreement further provided that the Plaintiffs were solely responsible for the selection, hiring, firing, supervising, instructing, training, discipline, and setting of wages, hours and working conditions of any such hired individuals.  (Agreements § 2.09; *see also* R. Bateman Dep. at 58.)

15.     The Agreements also gave Plaintiffs the contractual right to provide pick-up and delivery services to other carriers.  (Agreements § I.)

16.     Under the Agreements, Plaintiffs were responsible for all costs and expenses incidental to the maintenance, repair and operation of the vehicles that they leased to CEVA.  (*Id.* §§ 2.05, 2.06.)  They also agreed to provide truckers/automobile insurance, cargo liability insurance, workers' compensation insurance, and occupational accident insurance for the provision of their services under the Agreements.  (*Id.* § 3.02.)

17.     Plaintiffs agreed to collect payment from pick-up and delivery customers in certain circumstances as part of their provision of services under the Agreement.  (*Id.* § 4.04(c).)

18.     Plaintiffs acknowledged that CEVA did not guarantee them any amount of work and that their provision of services to CEVA under the terms of the Agreements could result in their realization of a profit or a loss.  (*Id.* § I.)

19.     Plaintiffs also agreed to immediately notify a CEVA manager if, at any time during the term of their contracts, they believed that anything other than an independent contractor relationship existed between themselves and CEVA.  (*Id.*)

### **Andrew Huggins Had An Independent Contractor Relationship With CEVA**

20.     Plaintiff Andrew Huggins had a significant amount of work experience in the trucking industry before contracting with CEVA.  He had previously worked for an independent contractor who owned a trucking company that provided pick-up and delivery services.  (A. Huggins Dep. at 50-51.)  Huggins did not own a vehicle or drive at this time, but he coordinated and managed the deliveries and other non-driving work involved in making the pick-ups and deliveries for this trucking company.  (*Id.* at 48, 52-53.)  Through this experience, Huggins developed a number of skills, such as customer service skills and skills regarding handling freight and coordinating driving routes that proved valuable when he began providing services to CEVA. (*Id.* at 54.)

21.     Based on his experience working for an independent contractor, Huggins decided that he would like to be in business for himself, and that he had the skills and experience to do so.  (*Id.* at 70-71.)  Therefore, in 2004, Huggins purchased a delivery vehicle, which was a truck over 10,000 pounds, and on the advice of his accountant, formed an S Corporation, AAH Trucking, Inc., of which he was the 100 percent shareholder.  (*Id.* at 30, 59-60, 68-69.) Thereafter, Huggins began providing pick-up and delivery services as an independent contractor. (*Id.* at 30-31, 70-72.)

22.     Huggins's first work experience as an independent contractor involved contracting with a trucking company from 2004 and until approximately March 2005.  (*Id.* at 22, 60, 64.)  The vehicle that Huggins owned and used to provide pick-up and delivery services to this company was the same vehicle that he used for the entire time that he provided pick-up and delivery services to CEVA.  (*Id.* at 61, 177.)

23.     Huggins, through his corporation, AAH Trucking, Inc., began contracting with CEVA on April 20, 2005.  (CEVA00003827-44.)  He was interested in entering into a business relationship with CEVA, because he believed that he had the potential to make approximately three times as much money contracting with CEVA as he was making pursuant to his existing contract to provide pick-up and delivery services.  (A. Huggins Dep. at 78.)

24.     Huggins understood that he would be an independent contractor when providing services for CEVA, and it was important to him that he would provide services to CEVA as an independent contractor, including because he wanted to operate a truck that he owned.  (*Id.* at 79-80, 86.)

25.     Huggins was also interested in contracting with CEVA because it was a "large scale company" with more stability than the trucking company that he had been contracting with until then.  (*Id.* at 85-86.)  Huggins was looking for a more stable supply of work, but he understood before he entered into a contract with CEVA that there would be no guaranteed amount of work available to him.  (*Id.* at 84, 86.)

26.     When contracting for CEVA, Huggins was interested in working whatever hours he felt would result in him getting the most work from CEVA.  (*Id.* at 104.)

27.     Huggins testified that when he began contracting with CEVA in 2005, the work was "[d]efinitely" assigned on a first-come, first-served basis.  (*Id.* at 107.)  The suitability of a

contractor's delivery vehicle for the dispatch in question also impacted assignments.  (*Id.* at 121.)

28.     Huggins's schedule varied, and he chose to arrive at the station at different times ranging from 4 a.m. to 12 noon or later to see if work was available.  (*Id.* at 110-12.)  In addition, CEVA dispatchers would sometimes call Huggins to say that work was available and ask him if he was interested in that work, but he understood that he was not obligated to accept that work.  (*Id.* at 108-110.)

29.     Huggins testified that in the 2005-2007 timeframe, independent contractors at the JFK station "would turn down work all the time," but Huggins said that because he wanted the opportunity to do the work, he was not interested in turning it down.  (*Id.* at 97.)

30.     After contracting with CEVA for approximately two years, Huggins began regularly servicing a particular area, which he liked, including because he made more money doing so.  (*Id.* at 119-121, 207-8.)  Huggins testified that once he began regularly servicing this area, he was still free to refuse the work offered to him in that area on any given day, and had no contractual obligation to service that area.  (*Id.* at 122-23.)  However, since he wanted a steady flow of work in order to make money, he testified that it did not make sense for him to turn down this work, since there was no guarantee that better work would be available.  (*Id.* at 122-25.)

31.     Huggins testified that, even when he was regularly servicing the same area, "no two days were alike" in terms of his work schedule.  (*Id.* at 126-27.)  He also testified that he decided what route he would take each day when servicing this area, and that as he got more familiar with the area, he was able to set up the route mentally, which allowed him to work more quickly and efficiently.  (*Id.* at 125-26.)

32.     Huggins testified that he was an exceptional independent contractor, which resulted in customers sometimes calling him directly to offer him work.  (*Id.* at 230-32.)

33.     With the exception of a single occasion during his entire contracting relationship with CEVA, when he said that his work was observed at random, Huggins testified that no one from CEVA supervised him when he was on the road providing pick-up and delivery services for CEVA and interacting with customers, and that he could do his work for CEVA the way that he wanted to do it.  (*Id.* at 249-250, 253-54.)

34.     Each year that he contracted with CEVA, Huggins hired individuals to assist him with his provision of pick-up and delivery services for CEVA.  (*Id.* at 157, 160.)  Huggins decided how much to pay these individuals, and he controlled their work.  (*Id.* at 172-74.)

35.     While contracting with CEVA, Huggins used the delivery vehicle that he owned and used to provide services to CEVA as his personal vehicle—including to go to the movies and to go shopping—when he was not providing services to CEVA.  (*Id.* at 180-81.)

36.     Huggins maintained an office for his corporation, AAH Trucking, Inc., that was separate and apart from his home.  (*Id.* at 190-91.)  In addition, he maintained a home office area for his business within his home.  (*Id.* at 193.)

37.     Huggins considered himself a business person running a small business.  (*Id.* at 278.)  He testified that, as any business should do, he assessed the state of his business from time to time and evaluated ways that he could improve it.  (*Id.* at 277-78.)

38.     IRS Form 1099 documents for the years 2005 to 2010 reflect nonemployee compensation paid by CEVA to "AAH Trucking Inc., Andrew Huggins" in the following amounts: $54,240.75 (2005), $68,313.73 (2006), $73,314.76 (2007), $62,489.30 (2008), $38,828.44 (2009), and $20,270.65 (2010).  (CEVA00017350-55.)

39.     Huggins' corporation took tax deductions for expenses incurred providing services for CEVA, including for expenses incurred in hiring helpers, renting office space for

AAH Trucking, Inc. and TV and cell phone expenses.  (A. Huggins Dep. at 212, 214-15.)

40.     Huggins made more money contracting with CEVA than he had made when contracting with a delivery company previously, and he was satisfied with the money that he made at CEVA.  (*Id.* at 47, 230.)  However, he also took financial losses when contracting with CEVA.  (*Id.* at 238-39.)  Huggins further testified as follows about the services that he provided for CEVA: "Every job was different, every day is different, you would make different amounts of money every single week so I would never be able to say I'm only going to make $4,000 this month or $3,000 this month, I would never know."  (*Id.* at 275.)

41.     In July 2010, CEVA exercised its right to terminate its contractual relationship with Andrew Huggins, effective August 2010.  (CEVA00000162-63.)

42.     After Huggins' contracting relationship with CEVA ended, he began doing pick-up and delivery work for a small business owner, using the same delivery vehicle that he used while contracting with CEVA.  (A. Huggins Dep. at 307.)

43.     Huggins has recently gone back to school and is currently a full-time student (*id.* at 309-310), but AAH Trucking, Inc. still exists (*id.* at 68-69).

**<u>Franklin Browning Had An Independent Contractor Relationship With CEVA</u>**

44.     Plaintiff Franklin Browning has over 35 years of professional driving experience in the trucking industry and testified: "in this industry, I'm a professional."  (F. Browning Dep. at 122, 263.)

45.     Browning has been a member of the Owner-Operator Independent Drivers Association, an association of professional truckers, for almost a decade.   (*Id.* at 22-23.)

46.     When he began contracting with CEVA, specifically, Browning already had approximately 25 years of experience in the trucking industry.  (*Id.* at 94-5.)

47.     Browning first worked as an independent contractor in the industry from 1975 to 1993, making pick-ups and deliveries for a messenger service, operating a delivery van that he owned.  (*Id.* at 30-31, 41-42.)  He learned how to deal with customers and negotiate the roads, which Browning considered important skills to have in the trucking business.  (*Id.* at 33-34.)

48.     In 1994, Browning bought a milk route for $25,000 and began contracting with a dairy company to deliver milk in a vehicle that he owned.  (*Id.* at 40-41.)

49.     Between 1995 and 2000, Browning continued working as an independent contractor for three other companies, in each case providing pick-up and delivery services using a delivery vehicle that he owned.  (*Id.* at 45-46, 53-55.)  Browning earned less money contracting with these companies, and in some cases significantly less money, than he earned when later contracting with CEVA.  (*Id.* at 61.)

50.     Prior to contracting with CEVA, Browning was also a half-owner of a pick-up and delivery business called Global Delivery Service.  (*Id.* at 90.)  Global Delivery Service was a "brick and mortar business," with an office and high overhead, and as a result of that business experience, Browning decided to pursue business opportunities—like his contracting relationship with CEVA—which had less overhead.  (*Id.* at 92-93.)

51.     Browning entered into six separate agreements with CEVA over a period of 10 years.  (*Id.* at 66, 69-70; CEVA00000175-233; CEVA00000236-253; CEVA00012392-408.)

52.     Browning entered into these Agreements with the intention of providing pick-up and delivery services as an independent contractor (F. Browning Dep. at 85), and it was important to him that he would be an independent contractor (*id.* at 243).  Browning testified that he will "always be an independent contractor."  (*Id.* at 245.)

53.     Since 1964, Browning has owned over 200 different vehicles.  (*Id.* at 147.)

54.     During his years providing pick-up and delivery services as an independent contractor for various companies, Browning would acquire a different delivery vehicle approximately every two years, because the vehicles wear out.  (*Id.* at 55, 147.)

55.     During the years that he was contracting with CEVA, Browning owned a total of three different vehicles, which he used to provide pick-up and delivery services under his contract.  (*Id.* at 147.)  He made investments of approximately $20,000, $32,000 and $52,000, respectively, to purchase these vehicles.  (*Id.* at 149.)

56.     Browning testified that he has done almost all of the repairs for the vehicles that he has ever owned (*id.* at 20), and that he does an excellent job maintaining his vehicles (*id.* at 242-43).  He also testified that he could personally overhaul and repair every part of a truck from front to back.  (*Id.* at 241.)

57.     Browning also invested in a fax machine for his business, which enabled him to fax paperwork to CEVA from his home office at the end of the day, thereby freeing him from the need to return to the station to do so.  (*Id.* at 168-170.)

58.     Browning hired his son to help him provide pick-up and delivery services for CEVA, and Browning decided to pay his son $14,000 for his services over a two-month period. (*Id.* at 180, 184.)

59.     Browning was aware of a contractor at the JFK station, who operated two or three trucks using hired drivers and would personally drive to provide services to CEVA only occasionally.  (*Id.* at 179-80.)

60.     It was Browning's choice whether or not to accept freight from CEVA to deliver to a customer, but once he accepted the freight, it was his responsibility to deliver it to the

customer within the time parameters set by the customer.  (*Id.* at 193.)

61.    While contracting with CEVA, Browning turned down assignments that were offered to him.  (*Id.* at 206).  Browning testified that when CEVA contractors turned down assignments that were offered to them, which they had the ability to do, it was usually because they did not think that the job paid enough.  (*Id.* at 213.)

62.    Browning would regularly come to the JFK station at 3:30 a.m. in order to secure lucrative work, and he chose to do this rather than come to the station later in the day and take a chance that work would be available at that later time.  (*Id.* at 197-98.)

63.    Browning's goal when contracting with CEVA was to get work every day, at least five days a week, and he liked the fact that, in comparison to the other companies with which he had contracted, he had a better chance of getting work every day when he was contracting with CEVA.  (*Id.* at 260-61.)

64.    Browning acknowledged that in the trucking industry, some deliveries are time-sensitive, and that these requirements are dictated by customers.  (*Id.* at 89-90.)

65.    By his own admission, Browning made a lot of money contracting with CEVA. (F. Browning Dep. at 117.)  For the majority of the time period that he contracted with CEVA, his compensation increased steadily year after year (*id.* at 124), and there were years when he netted a significant profit after expenses (*id.* at 214).

66.    Browning knew, however, that there was no guarantee that he would make any minimum amount of money per year when contracting with CEVA (*id.* at 151), and in 2009, Browning operated at a loss (*id.* at 214).

67.    IRS Form 1099 documents for the years 2001 to 2010 reflect nonemployee compensation paid by CEVA to Franklin Browning in the following amounts: $49,741.25

(2001); $55,979.29 (2002); $60,868.15 (2003); $88,660.84 (2004); $130,186.47 (2005);

$127,589.96 (2006); $135,943.66 (2007); $149,630.81 (2008); $38,093.45 (2009); and

$89,992.05 (2010).  (CEVA00015436-45.)

68.     After voluntarily terminating his contract with CEVA, Browning began providing

delivery services as an independent contractor for a company owned by his former business

partner.  (F. Browning Dep. at 217, 220-22.)  When providing delivery services for this

company, Browning used the same truck that he had used when providing delivery services to

CEVA.  (*Id.* at 222.)

69.     Browning conceded the he had more freedom as an independent contractor for

CEVA than he would have had in an employee position.  (*Id.* at 243-44.)

**Halls Trucking Corporation Had An Independent Contractor Relationship With CEVA**

70.     Plaintiff Trevor Halls and his uncle Plaintiff Hugh Halls became business partners

in March 2004, when they incorporated and equally financed Halls Trucking Corporation, which

has provided pick-up and delivery services for a series of companies ever since.  (H. Halls Dep.

at 39-41, 62, 75-78; T. Halls Dep. at 41.)

71.     Trevor and Hugh Halls are both 50 percent owners of Halls Trucking

Corporation.  (HA00476.)  Trevor Halls is the President and CEO of Halls Trucking

Corporation, and Hugh Halls is its Vice President and CFO.  (*Id.*; T. Halls Dep. at 44; H. Halls

Dep. at 86.)

72.     Trevor and Hugh Halls have had the same roles and responsibilities within Hall

Trucking Corporation since it was formed.  (H. Halls Dep. at 62; T. Halls Depo at 161.)  The

primary responsibilities of Trevor Halls have been to drive and maintain the trucks that Halls

Trucking Corporation uses to provide these services.  (H. Halls Dep. at 44, 86; T. Halls Depo at

44, 161.)  The primary responsibilities of Hugh Halls have been to handle all of the bookkeeping

for the corporation, and to assist with deliveries and serve as a navigator on the road, each day mapping out the route that he and Trevor Halls will take when providing services. (*Id.* at 44, 86.)

73.     Halls Trucking Corporation provided pick-up and delivery services for two other companies, one after the other, before beginning a business relationship with CEVA. (*Id.* at 45.) The corporation made significantly less money providing services to these companies than it made when it later provided services to CEVA. (*Id.* at 67-68; T. Halls Dep. at 53-54.)

74.     When Halls Trucking Corporation began its business relationship with CEVA, Trevor Halls already had ten years of experience as an independent contractor in the trucking industry operating delivery vehicles that he owned. (T. Halls Dep. at 20, 30-31.) As a result, he had developed a lot of skills with respect to dealing with customers and handling freight. (*Id.* at 33-34.) Because he was already an experienced professional driver, Trevor Halls did not receive any training from CEVA when Halls Trucking Corporation began providing services for CEVA. (*Id.* at 164.)

75.     Hugh Halls has undergraduate and master's degrees in banking and finance (H. Halls Dep. at 18-19), and he had started multiple small businesses before transitioning into the trucking business in 2004 (*id.* at 29, 34, 36, 38-41, 74-5). He testified that Trevor Halls got him involved in the trucking business and taught him everything he knows about that business. (*Id.* at 39, 47-48, 58.) Hugh Halls did not receive any training from CEVA when Halls Trucking Corporation began providing services for CEVA. (*Id.* at 116.) Indeed, he already had business management skills, skills with respect to delivery work, and familiarity with various DOT requirements applicable to Halls Trucking Corporation, all of which proved very useful when Halls Trucking Corporation began providing services to CEVA. (*Id.* at 47, 70-72.)

76.     The contractual agreements governing the business relationship between CEVA and Halls Trucking Corporation were Agreements For Leased Equipment And Independent Contractor Services dated August 2, 2004 and May 15, 2006, which were entered into between CEVA and Trevor Halls in his capacity as the President and CEO of Halls Trucking Corporation.  (CEVA00003485-3381.)

77.     When Halls Trucking Corporation began its business relationship with CEVA, Trevor Halls understood that it would have an independent contractor relationship with CEVA, and central to his understanding of what it meant to be an independent contractor was having the right to refuse work.  (T. Halls Dep. at 54-55.)

78.     This expectation was borne out by Halls Trucking Corporation's experience contracting with CEVA.  When Halls Trucking Corporation was offered a dispatch, Trevor and Hugh Halls would discuss whether or not to accept the dispatch.  (*Id.* at 70-71.)  Trevor Halls would then make the decision for Halls Trucking Corporation as to whether or not to accept the dispatch, based on criteria such as the freight size and timing requirements.  (*Id.*)

79.     Trevor Halls did, at times, refuse dispatches offered by CEVA on behalf of Halls Trucking Corporation.  (*Id.* at 85.)  When he refused dispatches, he would go home afterward, but he was aware of other CEVA contractors who strategically refused dispatches, because they wanted to hold out for more lucrative dispatch offers later in the day.  (*Id.*)

80.     Sometimes, when Trevor Halls believed that CEVA was not offering Halls Trucking Corporation enough compensation for a particular dispatch, he would successfully negotiate an increase in the compensation that CEVA offered to Halls Trucking Corporation for the dispatch.  (*Id.* at 72-73.)

81.     Trevor Halls testified that during Halls Trucking Corporation's business relationship with CEVA, he did not work a fixed schedule when providing services to CEVA. (*Id.* at 149-50.)

82.     Halls Trucking Corporation owned the equipment and tools that it used to provide pick-up and deliver services to CEVA, including two trucks.  (H. Halls Dep. at 79, 99-100. *See also, e.g.,* HA00364; HA00442.)

83.     When Halls Trucking Corporation began providing pick-up and delivery services for CEVA, it did so using the same vehicle, which was over 10,000 pounds, that it had previously used to provide such services to another company.  (H. Halls Dep. at 63.)

84.     Later on during its contractual relationship with CEVA, Halls Trucking Corporation expanded its business by acquiring a second, and significantly larger, vehicle, which could accommodate more freight.  (T. Halls Dep. at 96-99.)  This vehicle was over 26,000 pounds, so Trevor Halls was required by law to obtain a commercial driver's license to operate it.  (*Id.* at 97.)  In order to obtain this commercial driver's license, he attended a driving school, underwent special training and passed a test.  (*Id.* at 97-98.)  CEVA had no role or affiliation with respect to the driving school, training or test.  (*Id.* at 98.)

85.     For a period of time when Halls Trucking Corporation owned and operated both of these trucks concurrently, it hired two individuals to assist with its provision of pick-up and delivery services for CEVA.  (H. Halls Dep. at 87-88, 163-64.)  These two hired individuals performed pick-up and delivery work in one of Halls Trucking Corporation's vehicles, while Trevor and Hugh Halls performed pick-up and delivery work in the other.  (*Id.* at 88, 163.)  Halls Trucking Corporation decided how much to pay these individuals (*id.* at 165), and it treated them as independent contractors for tax purposes (*id.* at 165, T. Halls Dep. at 46).

86.     Trevor Halls acknowledged that he had the contractual right to hire someone to drive in his place and that there were CEVA contractors who did not personally drive the vehicles that they leased to CEVA, but rather, hired others to drive to provide pick-up and delivery services under their agreements with CEVA. (T. Halls Dep. at 142-43.)

87.     Payment for all of the pick-up and delivery services that Halls Trucking Corporation provided to CEVA and to other companies was either made directly to Halls Trucking Corporation, or to Trevor Halls, who then transferred such funds to Halls Trucking Corporation. (*Id.* at 49-50; H. Dep. at 72-73.)

88.     An IRS Form 1099 for 2004 reflects that, in 2004, nonemployee compensation in the amount of $54,333.89 was paid by CEVA to Trevor Halls. An IRS Form 1099 for 2005 reflects that, in 2005, nonemployee compensation in the amount of $156,728.32 was paid by CEVA to Trevor Halls. An IRS Form 1099 for 2006 reflects that, in 2006, nonemployee compensation in the amount of $207,076.73 was paid by CEVA to "Halls Trucking Corp." An IRS Form 1099 for 2007 reflects that, in 2007, nonemployee compensation in the amount of $211,620.95 was paid by CEVA to "Trevor A. Halls, Halls Trucking Corp." An IRS Form 1099 for 2008 reflects that, in 2008, nonemployee compensation in the amount of $189,132.18 was paid by CEVA to "Trevor A. Halls, Halls Trucking Corp." An IRS Form 1099 for 2009 reflects that, in 2009, nonemployee compensation in the amount of $171,363.22 was paid by CEVA to "Trevor A. Halls, Halls Trucking Corp." An IRS Form 1099 for 2010 reflects that, in 2010, nonemployee compensation in the amount of $107,767.10 was paid by CEVA to "Trevor A. Halls, Halls Trucking Corp." (CEVA00017357-63.)

89.     Trevor Halls testified that Halls Trucking Corporation was very successful in earning a substantial amount of money during the years that it contracted with CEVA, but that

there were nonetheless occasions during its relationship with CEVA when it operated at a loss. (T. Halls Dep. at 87-88, 106-7.)

90.     In July 2010, CEVA exercised its right to terminate its contractual relationship with Halls Trucking Corporation, effective August 2010.  (CEVA00000348-349.)

91.     After its contractual relationship with CEVA ended, Halls Trucking Corporation began providing pick-up and delivery services for another delivery company, Sun Logistics.  (H. Halls Dep. at 183-84; T. Halls Dep. at 157.)  At this time, the name of the corporation of the Halls changed slightly to "Halls Trucking Corporation of New York," because Trevor and Hugh Halls decided to incorporate their business in New York (it had previously been incorporated in New Jersey), and the name "Halls Trucking Corporation" was already registered in New York at the time.  (H. Halls Dep. at 75-76.)  Halls Trucking Corporation of New York currently provides pick-up and delivery services to Sun Logistics using the same vehicle that Halls Trucking Corporation used when providing pick-up and delivery services to CEVA.  (*Id.* at 184; T. Halls Dep. at 160.)

**Winston James Had An Independent Contractor Relationship With CEVA**

92.     Winston James had a significant amount of experience in the trucking industry prior to contracting with CEVA.  Before moving to the United States, James owned and operated a passenger transportation business in Jamaica, and also delivered merchandise for various companies there.  (W. James Dep. at 58-60.)  He also owned a bakery and managed that business and its employees.  (*Id.* at 121-22, 125-26.)

93.     In approximately 1998, after moving to the United States, James purchased a 26,000-pound delivery vehicle, and for the next several years, he provided services to multiple delivery companies as an independent contractor operating that vehicle.  (*Id.* at 40-42, 63-64, 78-79, 81, 87.)

94.     In 2003 or 2004, James purchased a newer vehicle of approximately 14,000 pounds, including because he recognized that most delivery companies were interested in working with individuals who could provide newer trucks.  (*Id.* at 73-74, 84.)  James used this vehicle to provide pick-up and delivery services to another company before entering into a contractual relationship with CEVA in September 2005, at which point, he began using this vehicle to fulfill his contractual obligations to CEVA.   (*Id.* at 83-84, 142; CEVA00003808.)

95.     The customer service and other skills that James had developed through his prior experiences in the trucking industry and as a small business owner helped prepare James for his contracting work with CEVA.  (W. James Dep. at 60, 62, 88.)

96.     James has also performed auto-mechanic work for the past 30 years (*id.* at 34), and his skills in this area also proved very beneficial during his business relationship with CEVA.  James personally serviced and performed weekly maintenance check-ups on the vehicle that he used to provide pick-up and delivery services to CEVA, and this was an important way that he was able to keep his operating costs down.  (*Id.* at 53-54, 277-78.)

97.     James testified that he did not receive any training from CEVA when he began contracting with CEVA, noting that he already had years of driving and delivery experience at that time.  (*Id.* at 303.)

98.     James was interested in entering into a business relationship with CEVA primarily because he thought he had the potential to make more money contracting with CEVA than he had made when providing services to other companies.  (*Id.* at 103-04, 117.)  James did, in fact, make significantly more money contracting with CEVA.  (*Id.* at 72-73, 85.)

99.     James knew before entering into a contractual relationship with CEVA that he would be providing services to CEVA as an independent contractor.  (*Id.* at 103-04.)  By his own

account, James has been self-employed for his entire life, and it has always been important to James that he be self-employed.  (*Id.* at 34-35.)

100.    When James provided pick-up and delivery services to CEVA, the assignments that he did with the most frequency were delivery dispatches known as "hot shots" and pick-ups of computers from schools.  (*Id.* at 143-44, 270-74.)

101.    James testified that "hot shot" dispatches were assigned on a first-come, first-served basis at CEVA (*id.* at 155-56, 175), and that the suitability of a contractor's delivery vehicle for the work in question could also impact assignments (*id.* at 172-73).

102.    When CEVA offered James the opportunity to take a "hot shot" dispatch, he would determine whether it was in his financial interest to accept the job based on the price that CEVA offered.  (*Id.* at 156.)  James negotiated with CEVA over the prices offered for "hot shots," and his negotiations would sometimes lead to a higher price, but he would also sometimes refuse CEVA's offer if CEVA's price was not high enough.  (*Id.* at 137-138, 162-63.)  With respect to pick-ups of computers from schools, James accepted these dispatches because, while difficult, they were very lucrative.  (*Id.* at 270-71, 274-75.)

103.    In early 2006, shortly after he began contracting with CEVA, James incorporated his trucking business, forming Triple J Trucking International, Inc.  (*Id.* at 118.)  He decided that it would be very advantageous to incorporate, including in order to avoid personal liability and obtain tax advantages.  (*Id.* at 126-128.)

104.    James has always been the sole owner of Triple J Trucking.  (*Id.* at 133-34.)

105.    An IRS Form 1099 for 2005 reflects that, in 2005, nonemployee compensation in the amount of $23,566.58 was paid by CEVA to Winston James.  An IRS Form 1099 for 2006 reflects that, in 2006, nonemployee compensation in the amount of $121,721.46 was paid by

CEVA to "Winston James, Triple J Trucking International Inc."  An IRS Form 1099 for 2007 reflects that, in 2007, nonemployee compensation in the amount of $91,268.09 was paid by CEVA to "Triple J Trucking Intern. Inc."  An IRS Form 1099 for 2008 reflects that, in 2008, nonemployee compensation in the amount of $112,079.96 was paid by CEVA to "Triple J Trucking Intern. Inc."  An IRS Form 1099 for 2009 reflects that, in 2009, nonemployee compensation in the amount of $76,938.66 was paid by CEVA to "Triple J Trucking Intern. Inc."  (CEVA00017344-17348.)

106.    Although James made significantly more money contracting with CEVA that he had made providing pick-up and delivery services to other companies previously, there were times during his contracting relationship with CEVA when James did not make enough money to cover expenses.  (W. James Dep. at 72-73, 85, 278-79.)

107.    In January 2010, CEVA exercised its right to terminate its contractual relationship with James, effective January 2010.  (CEVA00000164.)

108.    After his contracting relationship with CEVA ended, James began contracting with another company to provide delivery services, and he did so using the same vehicle that he used during his contracting relationship with CEVA.  (W. James Dep. at 304, 306-07.)  James currently provides delivery services in this capacity (*id.* at 306-07), and Triple J Trucking is currently an active corporation (*id.* at 130).

Dated:  New York, New York
        November 2, 2011

Respectfully submitted:

O'MELVENY & MYERS LLP


*/s/ Jeffrey I. Kohn*
Jeffrey I. Kohn
Jennifer M. Evans

Times Square Tower
7 Times Square
New York, NY  10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
jkohn@omm.com
jevans@omm.com

*Attorneys for Defendants*
*CEVA Freight, LLC; and EGL, Inc.*