**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
FRANKLIN BROWNING, individually and on
behalf of all other persons similarly situated who
were employed by CEVA Freight, LLC and
EGL, Inc. and/or any other entities with,
controlling, or controlled by CEVA Freight, LLC
or EGL, Inc.,

                         Plaintiffs,

                -against-

CEVA FREIGHT, LLC and EGL, LLC,

                    Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
10-cv-5594 (ADS)(AKT)

**APPEARANCES:**

**Virginia & Ambinder LLP**
*Attorneys for the Plaintiffs*
111 Broadway
14th Floor
New York, NY 10006
        By:    Lloyd Robert Ambinder, Esq.
                 James Emmet Murphy, Esq., of Counsel

**Leeds Morelli & Brown, PC**
*Attorneys for the Plaintiffs*
1 Old Country Road Suite 347
Carle Place, NY 11514
        By:    Jeffrey Kevin Brown, Esq.
                 Jessica Lorraine Parada, Esq.
                 Michael Alexander Tompkins, Esq., of Counsel

**O'Melveny & Myers LLP**
*Attorneys for the Defendants*
Times Square Tower
7 Times Square
New York, NY 10036
        By:    Jeffrey I. Kohn, Esq.
                 Jennifer Merzon Evans, Esq., of Counsel

**SPATT, District Judge.**

This proposed class action, concerning alleged unpaid wages and overtime wages, was brought pursuant to the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). The Defendants have now moved for summary judgment, arguing that the Plaintiffs are not entitled to recovery under either statute because they are properly classified as "independent contractors" rather than "employees". For the reasons set forth below, the Court grants the Defendants' motion.

## I. BACKGROUND

### A. Factual Background

The Plaintiffs are workers who presently are or were formerly employed by the Defendants, CEVA Freight, LLC ("CEVA") and EGL, LLC ("EGL") (collectively the "Defendants" or "CEVA"). CEVA is a supply chain management, transportation, and logistics services company. In particular, CEVA provides services such as air and ocean freight forwarding, customs brokerage, pick-up and delivery services, warehousing, and materials management. As a general matter, CEVA does not use employee drivers or CEVA-owned vehicles to provide domestic pick-up and delivery services. According to CEVA, it contracts with outside trucking businesses to provide these services, pursuant to independent contractor agreements.

There are a total of five plaintiffs who have filed consent forms in this action. Four of the five Plaintiffs—Andrew Huggins ("Huggins"), Franklin Browning ("Browning"), Trevor Halls and Winston James ("James") (the "Plaintiffs")—provided pick-up and delivery services to CEVA pursuant to Agreements for Leased Equipment and Independent Contractor Services (collectively, the "Agreements") with CEVA and/or its predecessor or affiliated entities. The

remaining Plaintiff, Hugh Halls, did not execute an agreement with CEVA but provided services pursuant to the agreement executed by the Plaintiff Trevor Halls, in his capacity as the President and CEO of Halls Trucking Corporation, which is a corporation co-owned by Trevor Halls and Hugh Halls. (Defs. 56.1 Stmt., ¶ 1.) Both before and after providing services to CEVA, the Plaintiffs provided pick-up and delivery services to other companies utilizing vehicles that the Plaintiffs owned. (Defs. 56.1 Stmt., ¶ 2.)

The Agreements between the parties, entitled "Agreement for Lease Equipment and Independent Contractor Services (Pick-Up & Delivery)", governed their business relationship and described in various respects how the Plaintiffs would be treated by CEVA. The contracts stated that neither the Plaintiffs nor their employees or agents would be considered employees of CEVA, and that nothing in the Agreements would be construed to create an employment relationship between the Plaintiffs and CEVA. The Plaintiffs also agreed to immediately notify a CEVA manager if, at any time during the term of their contracts, they believed that anything other than an independent contractor relationship existed between themselves and CEVA. (See Agreements, § 1.)

In order to effectuate the pick-up and delivery services, the Plaintiffs leased to CEVA the vehicles that they owned. (Agreements, § 2.01.) The Plaintiffs were responsible for all costs and expenses incidental to the maintenance, repair and operation of the vehicles that they leased to CEVA, including automobile insurance. The trucks were covered with vinyl CEVA logos on all sides of the vehicles. After 2003, these signs were affixed so that they were permanent. (Browning Dep. at 160:13-14.)

Although another passenger was not permitted in the Leased Vehicle without the prior written approval of CEVA, under the Agreements the Plaintiffs did have the ability to hire others

to perform or assist in performing their contractual obligations. In addition, the Plaintiffs were required to wear CEVA uniforms, under threat of termination.

The Agreements stated that the Plaintiffs agreed "to direct the operation of the Leased Vehicle and to determine the method, manner and means of performing the contractual obligations under [the] Agreement in all respects including, but not limited to, such matters as the rejection and acceptance of dispatches offered by [CEVA]; the days and time [the Plaintiffs] will operate the Leased Vehicle; the routes traveled; parking sites, and the repair of the Leased Vehicle, provided that [the Plaintiffs] fully and efficiently perform[ed their] obligations under [the] Agreement." (Id.) However, the Plaintiffs testified that they were typically assigned to one service area. (See, e.g., Browning Dep. at 126:14–25 ("I had the 119 zip code so I did everything going to the 119 zip code so if there was something going into Queens or Nassau County, that would not go into my truck. That would go to the guy that was doing Nassau County or the guy that was doing Queens, they got that work . . ."); Huggins Dep. at 118:15–23 ("due to dispatch giving me the work in that area consistently and a certain spot that covered a span of a certain area we considered it a route because again you go to the same spot").)

There were some parameters to the Plaintiffs' tasks; namely, CEVA would issue certain instructions regarding the results that the Plaintiffs were to accomplish under the Agreements, such as meeting time-sensitive service parameters, when required by CEVA customers. James testified at his deposition that they were required to comply with whatever decisions the dispatcher made when any issues arose during the course of performing their assignments. Further, the Plaintiffs were in constant contact with the Defendants through the use of Nextel cellular communication devices tied into CEVA's computer system. (Browning Dep. at 198.)

Under the Agreements, the Plaintiffs had the opportunity to decline to perform any pick-up or delivery services they wished, provided they advised CEVA.  Thus, the Plaintiffs could provide services to CEVA at days and times of their choosing.  On the other hand, the Plaintiffs have testified that in practice, they were told that if they were going to go away for a couple of days and hence not do pick-ups and deliveries for CEVA, they needed to notify the Defendants in advance so that the company could find someone to replace them.  (See James Dep. at 213:7–11; Huggins Dep. at 115:8–10.)  The Plaintiffs also testified that they were in essence "forced" to work certain days or times, or else CEVA would give the service areas to other drivers.  Accordingly, some of the Plaintiffs' testimony indicates that if they refused an assignment, they could end up with no work for that day.  Thus, the Plaintiffs allege that a rejection of a delivery would figure into future delivery orders.

The Plaintiffs had the contractual right under the Agreements to provide pick-up and delivery services to other carriers.  However, the Plaintiffs argue that this right was merely theoretical, because in practice the trucks were only to be used for CEVA business.  In addition, according to the Plaintiffs, they were required to attend mandatory monthly meetings at CEVA's offices.  If the Plaintiffs did not attend these meetings, they claim that they would not be dispatched.  (H. Halls Dep. at 91:11–15.)

CEVA never guaranteed that the Plaintiffs would secure a certain amount of work.  Rather, it was clear under the Agreement that the provision of services to CEVA could result in a profit or loss.  It is undisputed that CEVA did not pay the Plaintiffs based upon the hours that they worked.  Rather, CEVA paid the Plaintiffs a fee per pick-up or delivery, based upon the rates included in the Agreements.  (See, e.g., Def. Ex. A, § 4.01 ("For performance by Contractor of the contractual obligations under this Agreement, [CEVA] shall compensate Contractor on the

basis set forth in Appendix III . . . ").  CEVA did not withhold taxes from the compensation that it paid to the Plaintiffs.  Instead, it issued IRS Form 1099s to them at the end of each year.  Thus, the Plaintiffs were responsible for filing their own income tax returns in connection with their earnings. (See Agreements, § 4.09; Def. 56.1, at ¶ 5.)  Also, it is undisputed that the Plaintiffs regularly took significant tax deductions for expenses they incurred in providing services to CEVA.

### 1. Andrew Huggins

The Plaintiff Andrew Huggins, through his corporation, AAH Trucking, Inc., began contracting with CEVA on April 20, 2005.  Huggins understood that he would be an independent contractor when providing services for CEVA, and it was important to him that he would provide services to CEVA as an independent contractor, in part because he wanted to operate a truck that he owned.  (Huggins Dep. at 79-80, 86.)  His schedule varied, and he would consent to certain assignments when they were available if he was interested.  However, he understood that he was never obligated to accept pick-ups or deliveries.  At some point, Huggins was regularly servicing a particular geographic area, because he made more money doing so.  (Id. at 119–121, 207–8.)  Nevertheless, he had control over the specifics within the geographic region he chose to take assignments in, so that he would decide what route to take.  Huggins testified that he was not usually supervised by CEVA.  However, on one occasion, CEVA sent someone to follow his truck in a random fashion and he was subsequently informed by the company that he was being followed.  (Id. at 249–50.)  He further stated that he did not think the company monitored him in any way.

The Defendants claim that the vehicle Huggins used for his work at CEVA was also his personal vehicle when he was not performing services for the Defendants.  For example, he

would use this vehicle to go to the movies and go shopping.  (Id. at 180–81.)  However, the other

Plaintiffs testified that CEVA supervisors repeatedly warned the Plaintiffs that they were not

permitted to use their trucks for non-CEVA purposes.  (See, e.g., Browning Dep. at 172:17–

173:11 ("the loading dock supervisor said to me—pointed at me and said you can get terminated

for hauling other people's freight around.  I said it's my own personal merchandise . . . he told

me that I could not use the truck for personal business, that's what he said to me."); Murphy

Dep. at 123:19–22 ("you could not use the truck to do anything else.  They tell you this.  If you

need to make extra bucks, a few extra bucks on Sunday, you can't.").)

IRS Form 1099 documents for the years 2005 to 2010 reflect nonemployee compensation

paid by CEVA to "AAH Trucking Inc., Andrew Huggins" in the following amounts: $54,240.75

(2005), $68,313.73 (2006), $73,314.76 (2007), $62,489.30 (2008), $38,828.44 (2009), and

$20,270.65 (2010).  (Defs. 56.1 Stmt., at ¶ 38.)  In addition, Huggins' corporation, AAH

Trucking Inc., took tax deductions for expenses it incurred in providing services for CEVA, such

as renting office space and cell phone expenses.  (Huggins Dep. at 212, 214–15.)  In July 2010,

CEVA exercised its right to terminate its contractual relationship with Andrew Huggins,

effective August 2010.

### 2.  Franklin Browning

The Plaintiff Franklin Browning had more than 25 years of experience in the trucking

industry prior to his relationship with the Defendants.  Browning entered into six separate

agreements with CEVA over a ten year period. (Browning Dep. at 66, 69-70).  He entered into

these agreements with the intention of providing pick-up and delivery services as an independent

contractor, which was important to him.  (Id. at 245 [testifying that he will "always be an

independent contractor"].)  During the years that he was contracting with CEVA, Browning

owned a total of three different vehicles, which he used to provide pick-up and delivery services under the terms of his contract. Browning also hired his son to help him provide pick-up and delivery services for CEVA, and Browning paid him $14,000 for his services over a two-month period. While contracting with CEVA, Browning turned down assignments that were offered to him. (Id. at 206.) Browning testified that he knew that there was no guarantee that he would make any minimum amount of money per year when contracting with CEVA. (Id. at 151.) IRS Form 1099 documents for the years 2001 to 2010 reflect nonemployee compensation paid by CEVA to Franklin Browning in the following amounts: $49,741.25 (2001); $55,979.29 (2002); $60,868.15 (2003); $88,660.84 (2004); $130,186.47 (2005); $127,589.96 (2006); $135,943.66 (2007); $149,630.81 (2008); $38,093.45 (2009); and $89,992.05 (2010). (Defs. 56.1 Stmt., at ¶ 67.)

### 3. Trevor Halls and Hugh Halls

Halls Trucking is co-owned by Trevor Halls and his uncle Hugh Halls. Trevor Halls is the President and CEO of Halls Trucking Corporation and Hugh Halls is its Vice President and CFO. (T. Halls Dep. at 44; H. Halls Dep. at 86.) Primarily, Trevor drives and maintains the trucks, while Hugh handles all of the bookkeeping and assists with deliveries by acting as a navigator on the road. The contractual agreements governing the business relationship between CEVA and Halls Trucking Corporation were Agreements For Leased Equipment And Independent Contractor Services dated August 2, 2004 and May 15, 2006, which were entered into between CEVA and Trevor Halls, in his capacity as the President and CEO of Halls Trucking. Trevor Halls understood that his company would have an independent contractor relationship with CEVA, and that largely meant to him that he would have the right to refuse work. (T. Halls Dep. at 54–55.) In fact, Trevor testified that at times he did refuse dispatches

offered by CEVA on behalf of Halls Trucking Corporation.  (Id. at 85.)  In addition, Halls

Trucking owned the equipment and tools that it used to provide pick-up and delivery services to

CEVA.  (H. Halls Dep. at 79, 99-100.)

An IRS Form 1099 for 2004 reflects that, in 2004, nonemployee compensation in the

amount of $54,333.89 was paid by CEVA to Trevor Halls.  An IRS Form 1099 for 2005 reflects

that, in 2005, nonemployee compensation in the amount of $156,728.32 was paid by CEVA to

Trevor Halls.  An IRS Form 1099 for 2006 reflects that, in 2006, nonemployee compensation in

the amount of $207,076.73 was paid by CEVA to "Halls Trucking Corp."  An IRS Form 1099

for 2007 reflects that, in 2007, nonemployee compensation in the amount of $211,620.95 was

paid by CEVA to "Trevor A. Halls, Halls Trucking Corp."  An IRS Form 1099 for 2008 reflects

that, in 2008, nonemployee compensation in the amount of $189,132.18 was paid by CEVA to

"Trevor A. Halls, Halls Trucking Corp."  An IRS Form 1099 for 2009 reflects that, in 2009,

nonemployee compensation in the amount of $171,363.22 was paid by CEVA to "Trevor A.

Halls, Halls Trucking Corp."  An IRS Form 1099 for 2010 reflects that, in 2010, nonemployee

compensation in the amount of $107,767.10 was paid by CEVA to "Trevor A. Halls, Halls

Trucking Corp."  In July 2010, CEVA exercised its right to terminate its contractual relationship

with Halls Trucking Corporation, effective August 2010.

### 4.  Winston James

Winston James entered into a contractual relationship with CEVA in September 2005.

James testified that he knew before entering into a contractual relationship with CEVA that he

would be providing services to CEVA as an independent contractor. (James Dep. at 103–04.)

Shortly after initiating his relationship with CEVA, James incorporated his trucking business,

forming Triple J Trucking International, Inc.  An IRS Form 1099 for 2005 reflects that, in 2005,

nonemployee compensation in the amount of $23,566.58 was paid by CEVA to Winston James. An IRS Form 1099 for 2006 reflects that, in 2006, nonemployee compensation in the amount of $121,721.46 was paid by CEVA to "Winston James, Triple J Trucking International Inc." An IRS Form 1099 for 2007 reflects that, in 2007, nonemployee compensation in the amount of $91,268.09 was paid by CEVA to "Triple J Trucking Intern. Inc." An IRS Form 1099 for 2008 reflects that, in 2008, nonemployee compensation in the amount of $112,079.96 was paid by CEVA to "Triple J Trucking Intern. Inc." An IRS Form 1099 for 2009 reflects that, in 2009, nonemployee compensation in the amount of $76,938.66 was paid by CEVA to "Triple J Trucking Intern. Inc." In January 2010, CEVA exercised its right to terminate its contractual relationship with James, effective January 2010.

## B.  Procedural History

On December 2, 2010, the named Plaintiff Franklin Browning, individually and on behalf of all other persons similarly situated who were employed by the Defendants, commenced this proposed Rule 23 class action and FLSA collective action for violations of the FLSA, 29 U.S.C. §§ 206, 207, 216(b), as well as Articles 6 and 19 of the NYLL and the wage orders, rules and regulations promulgated pursuant to these laws.  The action is to recover unpaid wages and overtime wages allegedly owed to the Plaintiffs.  The Plaintiffs allege that beginning in approximately 2004, and continuing through the present, the Defendants have engaged in a pattern and practice of withholding all earned wages and overtime payments through means of improperly classifying the named Plaintiff and others similarly situated as "independent contractors."

On January 13, 2012, the Defendants CEVA and EGL filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Fed. R. Civ. P. 56").

## II.    DISCUSSION

### A.  Legal Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under the provisions of Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).  However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support

of the nonmoving party's case." <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B.** <u>**As to Whether the Plaintiffs are Employees or Independent Contractors**</u>

As stated above, the Plaintiffs, who previously provided pick-up and delivery services to the Defendants, are bringing suit pursuant to the NYLL and the FLSA. However, the threshold issue that forms the core of the instant summary judgment motion is whether the Plaintiffs are properly qualified under these statutes as independent contractors or employees. <u>See Deboissiere v. Am. Mod. Agency</u>, No. 09 Civ. 2316, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010) ("New York's labor laws apply only to employees, not independent contractors."); <u>Campos v. Zopounidis</u>, No. 09 Civ. 1138, 2011 WL 2971298, at *3 (D. Conn. July 20, 2011) ("The FLSA broadly defines an employee as 'any individual employed by an employer' and defines 'employ' as 'to suffer or permit to work.' 29 U.S.C. §§ 203(e)(1), (g). Independent contractors are not covered by the FLSA.").

Whether this is a factually based inquiry or a pure legal dispute depends largely on the circumstances of the individual case. The Second Circuit explored this precise issue in <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149 (2d Cir. 1998). The court explained that in a previous case, it "discussed factors to be considered in determining whether a person was an employee or an independent contractor in light of the totality of the circumstances, and . . . noted that the 'existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law.'" <u>Id.</u> (quoting <u>Brock v. Superior Care, Inc.</u>, 840 F.2d 1054, 1059 (2d Cir. 1988)). On the other hand, the <u>Kirsch</u> court explained that a New York State court had stated that the question of "whether [a] plaintiff was an employee or an independent contractor" within the meaning of the

NYLL is "a question of fact for trial." <u>Rivers v. Butterhill Realty</u>, 145 A.D.2d 709, 711, 534

N.Y.S.2d 834, 836 (3rd Dep't 1988); <u>see Hernandez v. Chefs Diet Delivery, LLC</u>, 81 A.D.3d

596, 915 N.Y.S.2d 623 (2nd Dep't 2003) ("However, the nature of the relationship is fact

sensitive and often presents a question for the trier of fact").  In the end, the <u>Kirsch</u> court never

answered the "bottom-line question", finding that "whether a plaintiff was an employee or an

independent contractor is characterized as a question of law or a question of fact, however, we

cannot see that the submission of that question to the jury warrants a new trial." <u>Kirsch</u>, 148

F.3d at 171

　　　Despite <u>Kirsch</u>'s hesitation about finding as a matter of law that workers should be

categorized as employees or independent contractors, it now seems clear that a Court may make

that determination when there are no disputed issues of material fact.  <u>See Schwind v. EW &</u>

<u>Assocs., Inc.</u>, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) ("Finally, '[t]he existence and degree of

each factor is a question of fact while the legal conclusion to be drawn from those facts—

whether workers are employees or independent contractors—is a question of law.'") (quoting

<u>Brock</u>, 840 F.2d at 1059)); <u>Sikorski v Burroughs Drive Apartments, Inc.</u>, 306 A.D.2d 844, 845,

762 N.Y.S.2d 718, 721 (4th Dep't 2003) ("While the determination whether a worker is an

employee or an independent contractor 'usually presents questions of fact sufficient to preclude

summary judgment, where evidence is undisputed, and the facts are compellingly clear, the issue

may be determined as a matter of law'" (quoting <u>Greene v. Osterhoudt</u>, 251 A.D.2d 786, 787,

673 N.Y.S.2d 272 (3rd Dep't 1998)).

　　　In the present case there are essentially no factual disputes, and thus under the particular

circumstances here, the Court finds that this motion presents a pure legal question that can be

resolved at the summary judgment stage.

### 1. The NYLL Standard

"Under New York law, a person's status as an employee or an independent contractor is a fact-intensive inquiry that depends upon factors such as whether the person: (1) worked at his [or her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule." Deboissiere v. Am. Mod. Agency, No. 09 Civ. 2316, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010); see Bynog v. Cipriani Group, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 802 N.E.2d 1090 (2003); see also Bhanti v. Brookhaven Memorial Hosp. Med. Ctr., Inc., 260 A.D.2d 334, 687 N.Y.S.2d 667 (2nd Dep't 1999). The New York law focuses "on the degree of control exercised by the purported employer over the results produced or the means used to achieve the results", rather than "the economic reality of the situation", which is the emphasis of the FLSA standard. See Velu, 666 F. Supp. 2d at 307. New York courts have noted that it is a "significant consideration" if the person classifies himself or herself as an independent contractor for income tax purposes. See Gagen v. Kipany Productions, Ltd., 27 A.D.3d 1042, 1043–44, 812 N.Y.S.2d 689, 690–91 (3rd Dep't 2006).

"[C]ontrol over the means is the more important factor to be considered", Matter of Ted Is Back Corp. (Roberts), 64 N.Y.2d 725, 726, 485 N.Y.S.2d 742, 475 N.E.2d 113 (1984), and "[m]inimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship." Bhanti v Brookhaven Mem. Hosp. Med. Ctr., 260 A.D.2d 334, 335, 687 N.Y.S.2d 667 (2nd Dep't 1999). "Where the proof on the issue of control presents no conflict in evidence or is undisputed, the matter may properly be determined as a matter of law." Id.

## 2. The FLSA Standard

"Under the FLSA, the question of whether an employee-employer relationship exists is one of 'economic reality.'" Velue v. Velocity Exp., Inc., 666 F. Supp. 2d 300, 305 (quoting Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961)). See, e.g., Real v. Driscoll Strawberry Assocs., Inc., 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA"); Scantland v. Jeffry Knight, Inc., No. 09 Civ. 1985, 2012 WL 1080361, at *6 (M.D. Fla. Mar. 29, 2012) ("Economic reality controls over labels or subjective intent as to the ultimate issue of Plaintiffs' status as independent contractors or employees"); Harris v. Attorney Gen. 'l of the U.S., 657 F. Supp. 2d 1, 10 (D. D.C.2009) ("While contracts manifest the parties' intent, they do not necessarily reflect 'economic realities'"). Thus, in order to distinguish employees from independent contractors, federal courts generally apply a five-part test drawn from United States v. Silk, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L. Ed. 1757 (1947). In particular, courts consider:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence and duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Godoy v. Rest. Opportunity Ctr. of N.Y., Inc., 615 F. Supp. 2d 186, 192–93 (S.D.N.Y. 2009).

Thus, this analysis is slightly different than the inquiry under the NYLL, but is nevertheless substantially similar. The first factor is essentially identical to the relevant inquiry under the NYLL, but focuses on other key factors as well. These factors are not exhaustive, and courts are cautioned to keep in mind the totality of the circumstances surrounding the economic reality. See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed.

1772 (1947); Brock v. Superior Care, 840 F.2d 1054, 1059 (2d Cir. 1988) (rejecting the mechanical application of the test); see also Barfield v. N.Y. City Health and Hospitals Corp., 537 F.3d 132, 141–42 (2d Cir. 2008) ("[T]he various factors relied upon by this court . . . state no rigid rule for the identification of an FLSA employer. To the contrary . . . they provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA.") (internal citations omitted).

### 3. The Plaintiffs are Independent Contractors Under the NYLL

As set forth above, the relevant analysis under the NYLL entails an assessment as to whether the Plaintiffs: (1) worked at their own convenience; (2) were free to engage in other employment; (3) received fringe benefits; (4) were on the employer's payroll; and (5) were on a fixed schedule. The Court will address each of these factors in turn. Under New York law, the inquiry of whether one qualifies as an employee or independent contractor can be a question of law for the Court on a motion for summary judgment if the evidence in the record is undisputed. Harjes v. Parisio, 1 A.D.3d 680, 766 N.Y.S.2d 270 (3d Dep't 2003); see also Barak v. Chen, 87 A.D.3d 955, 929 N.Y.S.2d 315 (2nd Dep't 2011). Here, there are no facts that are in contention.

Generally speaking, the Defendants mainly focus on the contractual agreements between the parties, and the Plaintiffs focus on the actual working relationship between the parties. It is crucial to note that the Agreement itself is not dispositive. As stated by one New York court:

> Written distributorship or franchise agreements which seek to preclude employer-employee relationships, particularly where drivers and deliverymen are involved, have become commonplace. However, language in an agreement to the contrary notwithstanding, if the evidence establishes that sufficient supervision, direction and control is exercised over the drivers, an employer-employee relationship may be found.

Matter of Pepsi Cola Buffalo Bottling Corp., 144 A.D.2d 220, 534 N.Y.S.2d 532, 534 (3rd Dep't 1988); see also Nassau Edu. Chapter of Civil Service Employees Ass'n, Inc., 85 A.D.2d 733, 445 N.Y.S.2d 812 (1981) (explaining that when investigating the distinction between the employee-employer and the employer-independent contractor relationship, "[m]ere examination of the agreement between the parties will not suffice . . . for it is necessary to look behind the terms of the contract to determine the actual relationship") (internal citations omitted).

The Court will first assess whether the Plaintiffs worked at their own convenience. There is no question that under the Agreements, the Plaintiffs had the ability to accept or decline certain pick-up and delivery assignments, and thus in theory could work at their own convenience. The ability to reject assignments without penalty can support a finding of independent contractor status. See Anyan v. New York Life Ins. Co., 192 F. Supp. 2d 228, 239 (S.D.N.Y. 2002); Barak v. Chen, 87 A.D.3d 955, 929 N.Y.S.2d 315 (2nd Dep't 2011) (considering fact that drivers had discretion to reject dispatches as helping to establish, as a matter of law, that workers were not employees). Cf. Claim of Duffy, 172 A.D.2d 914, 568 N.Y.S.2d 201 (3rd Dep't 1991) (citing fact that Duffy was not allowed to refuse any loads that the company asked him to haul as evidence in support of employee designation).

Moreover, the Plaintiffs could select their assignments based upon what time of day they chose to work and whether they thought it was worth the time or money. See Cassaro v. Horton, 89 A.D.3d 1288, 1289, 933 N.Y.S.2d 751, 752 (3rd Dep't 2011) ("Claimant could choose how many loads he transported and the amount of time he took to transport the loads, so long as he arrived at the destination yard prior to its closing."). But see In re Pozarycki, 292 A.D.2d 661, 662, 738 N.Y.S.2d 748, 749 (3rd Dep't 2002) ("The fact that he could reject an assignment and

had discretion with regard to the time within which the assignment had to be performed, . . . does not, in our view, necessarily establish that he was an independent contractor.").

The Defendants assert in their memorandum of law that the "Plaintiffs were free under the Agreements to decline any dispatch without penalty, provided that they had not already advised CEVA that they would accept it, and they admitted that they could, and did, refuse assignments." (Defs. Mem. at 13.) However, the Plaintiffs assert that this freedom described in the Agreement to accept or reject assignments was heavily constrained by the fact that they would essentially be penalized, in reality, if they were to do so. Specifically, the Plaintiffs claim that they feared or suffered repercussions if they refused job assignments. (See Huggins Dep. at 131 ("One of the many mandatory meetings it was explained to us . . . if we come in and there is work being given to us whatever it is, if we refuse it, your name gets written refused next to your name and you go to the bottom of the list and you are not given work until they go down the list again.").

It is true that if the Defendants did penalize the Plaintiffs for refusing assignments, this could support a finding that the Plaintiffs were in fact treated like employees. See In re Westney, 262 A.D.2d 894, 896, 692 N.Y.S.2d 501 (3rd Dep't 1999) ("Additionally, claimant testified that he could not refuse work without suffering the loss of future assignments. Such testimony, coupled with other evidence in the record, supports the Board's conclusion that Classic exercised sufficient direction and control over claimant and others similarly situated to establish an employment relationship."). Cf. Williman v. Ross, 81 A.D.2d 997, 998, 440 N.Y.S.2d 64 (3rd Dep't 1981) (considering testimony that the workers were free to reject assignments without penalty as support for a finding of independent contractor status). However, there is no evidence in the record to indicate that the Plaintiffs were in fact "penalized" for turning down assignments.

Rather, the testimony merely establishes that the way CEVA's assignment system worked was that if the Plaintiffs refused an assignment, the next available assignment would be offered to other waiting drivers before it would be offered to the Plaintiffs again. In this way, every willing driver got a turn. As a result, while a refusal to complete an assignment may have factored into a subsequent assignment decision, this does not render the refusal subject to a "penalty".

Moreover, the testimony did not establish that in practice it was a direct consequence that a refusal to take on an assignment would result in a penalty. The Plaintiffs' depositions indicate that assignments by the dispatcher were largely based upon politics. For instance, when questioned further about this supposed "penalty" of being placed on the bottom of the assignment list, Huggins testified that:

> When I say you don't get any work, that's also a matter of the dispatcher's relationship with you at the time as well so there were people that went to the bottom of the list because they refused work, but it also became very political as far as the work that was being given to some people was work that they knew they would have been refused and they go to the bottom of the list and by the end of the day they are still there so back to me saying I saw it, it didn't happen to me so much because I had a better relationship with the dispatchers than some people, but it became a problem later on.

(Huggins Dep. at 132.) Huggins further stated that "there are so many factors that goes [sic] into the factor if they give me the work". (Huggins Dep. at 133.) Browning also testified that before 2004, assignments were given out based upon "favorites, who was friends with who and who paid the most money to get the work otherwise generally it was a pecking order." (Huggins Dep. at 109.)

Even if all of these allegations are taken as true, that a worker could possibly have been put to the bottom of the list once they refused an assignment, the testimony also indicates that in practice the assignment system was based upon a variety of factors, and that the methods used by

CEVA were largely, and unfortunately, political in nature. Thus, the Court finds that there is insufficient evidence in the record to find that the Plaintiffs were unable to refuse assignments because they were somehow punished by CEVA for doing so.

Next, in connection with the convenience factor, there is no doubt that the Plaintiffs could hire their own additional workers to assist with their operations. In fact, several of the Plaintiffs did so. Thus, this freedom allowed them to further work at their own convenience. See N.Y. Jur. Agency § 394 ("Ordinarily, the facts that a contractor hired his or her own employees or assistants and that the employer had no right to employ or discharge them or suggest changes in personnel of those in the contractor's employ are some indication of an independent contractor relationship.")

While there were certain time limits imposed upon the Plaintiffs as to when they should pick-up or deliver packages, these constraints stemmed from the nature of the business, as opposed to CEVA in particular. It is reasonable that a company such as CEVA would impose boundaries of this nature in the shipping business. See Velu, 666 F. Supp. at 307 ("Plaintiff worked at his own convenience, subject to the demands of the clients."); Edwards v. Publrs. Circulation Fulfillment, Inc., 268 F.R.D. 181, 186 (S.D.N.Y. 2010) ("the requirements that a specified number of deliveries be made 365 days a year during specified times to specified locations, merely reflect —in an entirely appropriate and understandable way—the intended results of the PCF-deliverer relationship. It is undisputed that they are the requirements imposed upon PCF by its clients").

As for whether the Plaintiffs were on a fixed schedule, it is undisputed that there were no set hours mandated by CEVA. The Defendants contend that the Plaintiffs were given complete freedom regarding the days and times that they would operate their vehicles for CEVA. They

point to the Plaintiffs' deposition testimony to support this factor.  (See, e.g., Huggins Dep. 126–27 ("no two days were alike").)  Also, under the Agreements, the Plaintiffs were plainly permitted to work as little or as much as they wished, and there were no set hours required by CEVA.  Although the Plaintiffs may have chosen to work on a more regular basis, this is not dispositive.  Voluntarily adhering to one's own set schedule does not render one an employee under the NYLL.  Further, the fact that some of the Plaintiffs felt it necessary to get to the relevant location by a certain time in order to get the better assignments from CEVA is also not dispositive.  "Even independent contractors, although 'independent' in name, are required to keep to a schedule.  The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor."  DeSouza v. EGL Eagle Global Logistics, 596 F. Supp. 2d 456, 466 (D. Conn. 2009).  As another court from this district noted, it is "in the very nature of the [Plaintiffs'] work—delivering and picking up packages—that obliged them to work on certain days and at certain times.  Customers would surely not accept deliveries at all hours of the night."  Johnson v. FedEx Home Delivery, No. 04 Civ. 4935, 2011 WL 6153425, at *14 (E.D.N.Y. Dec. 12, 2011).

The Plaintiffs claim that they were required to give advance notice if they planned on taking a vacation, and thus they were practically on a fixed schedule.  However, if the Plaintiffs chose to conduct pick-ups or deliveries on a regular basis, it seems reasonable to the Court that the Defendants would request some advance notice if they were going to be absent in order to adequately prepare, and thus this would not weigh in favor of finding that the Plaintiffs were employees.  See Claim of Pavan, 173 A.D.2d 1036, 570 N.Y.S.2d 696 (3rd Dep't 1991) (concluding that even though drivers had to let the dispatcher know when they would be unavailable for extended periods of time, that only indicated "incidental control over the results

produced"). But see Taracido v. U.S., No. 93 Civ. 8266, 1995 WL 217525, at *6 (S.D.N.Y. April 12, 1995) ("Medical Directions controls many aspects of his work. Medical Directions establishes Dr. Reiber's hours and Dr. Reiber must notify it when he intends to take vacation or personal time.").

The next relevant inquiry is whether the Plaintiffs were free to engage in other employment. Certainly, the ability to take on other employment supports a finding of independent contractor status. Once again, the Defendants emphasize the parties' contractual relationship only and the Agreements clearly indicate that the Plaintiffs may work for another employer. However, the Plaintiffs contend that this possibility was only theoretical and that it was practically impossible to do so because they were told by supervisors that their vehicle could only be used for CEVA purposes. The Plaintiffs point to a New York State case from 1992, where the Appellate Division determined that the evidence did not permit resolution of the issue of independent contractor status upon the record, in part because although Ruiz could perform work other companies, it was undisputed that he continued to make deliveries exclusively for the employer. Bermudez v. Ruiz, 185 A.D.2d 212, 586 N.Y.S.2d 258 (1st Dep't 1992).

As an initial matter, the Court finds that the fact that the Plaintiffs did not actually take on additional employment, does not automatically result in a denial of the Defendants' motion for summary judgment. See, e.g., Velu, 666 F. Supp. 2d at 307 ("Plaintiff has not chosen to avail himself to the opportunity to work for other shipping companies, but that is by choice."). More importantly, the Court finds that the Plaintiffs could perform work for other companies, even if it was practically difficult to do so. There are no disputed issues of material fact in this regard and the Court finds that, in light of the totality of the circumstances analyzed here, the fact that the Plaintiffs worked exclusively for the Defendants does not necessarily lead to the conclusion that

they qualify as employees under the NYLL when few, if any, other factors support that determination.

The Defendants assert, and the Plaintiffs do not dispute, that as a general matter they could have taken on any other work with any other company. Specifically with regard to the trucks the Plaintiffs used for their work with CEVA, the Defendants claim that under the Agreements, the Plaintiffs could use the truck for other purposes—personal or otherwise—as long as they were not carrying freight for CEVA at the time and if they covered up the CEVA logos on the vehicles. The Plaintiffs assert that this was "highly impractical" because of the large scale of the logo on all sides of the truck. (Browning Dep. at 164.) Nevertheless, it seems to have been possible to do so, and not a single one of the Plaintiffs disputed the fact that if the logo was covered, it could have been used for non-CEVA purposes. Browning testified that "[i]f there was a way of successfully covering up [the] logo so they would not come off, okay, it's possible that it could have been used for personal use." (Browning Dep. at 165–66.) Four out of five Plaintiffs did not even try to attempt to cover up the logo to utilize their truck for other purposes. One Plaintiff had an experience where his use of an inexpensive magnet blanket was ineffective to cover the truck because it would blow off the vehicle when driven. However, he admitted that he did not look into any other options—beyond the $30 magnetic material—to cover the CEVA logos on the truck. He said from his experience it was "impractical" to cover because of the weight, cost, and size. However, there is no proof in the record to support that notion, other than the Plaintiffs' assumptions.

Some of the Plaintiffs also testified that they were told by supervisors not to use their trucks for personal business. For instance, Browning testified that he was told by a supervisor that he "could not use the truck for personal business", and that supervisors from CEVA "said

we could not use it for personal use and they terminated a driver for using it for personal use." (Browning Dep. at 174, 175.)  However, Browning could not answer whether that was a categorical rule or only that they could not use the truck for personal business unless the CEVA logo was covered up, which the Defendants do not dispute needed to be done.  Hugh Halls testified that "there was nothing you could do with the truck anyhow because according to CEVA's rules you could not use the truck for any other non CEVA transaction so if you could not use the truck for a non CEVA transaction it didn't make sense having the truck on the road, you might as well take it back and park it." (H. Halls Dep. at 119.)  In addition, "[m]anagement" told Hugh Halls that he could not use the truck for "any other reason." (Id. at 120.)  However, when questioned as to the whether this statement had qualifications, he testified only that it was practically impossible to cover the logo up.  Thus, it seems that the appearance of CEVA's logo was what prevented the Plaintiffs from engaging in other employment and this was the message conveyed by management.

James testified that "I could not work my truck with anybody but CEVA, that's what they told me". (James Dep. at 218.)  But again, James testified that if he wanted to do work for other companies using the truck, he "would have to cover the whole truck because the whole truck has CEVA signs." (Id.)  James testified that it would be impossible to cover, but when questioned if he ever tried to cover the signs with magnetic blankets, he stated that he did not try. (Id. at 219.)  His testimony also makes it apparent that the rule not to use the CEVA truck for other purposes was in essence qualified, because he stated that "[s]o long as it has the CEVA sign you are not supposed to use it and do nothing because if anything happen they don't insure any other freight." (Id. at 220.)  All Huggins testified to was that "[m]e personally possibly if I went through the process again of finding someone to drive the truck that had CEVA marked all over

it, but the CEVA truck itself I felt no window of opportunity to use that same truck, not only because of the hours it would have to have run to work and the instability that I couldn't honestly work somewhere else and say I'm available this[,] this [,] and that day to work and that was my only truck and I wasn't making more money then I already had the opportunity to make so I couldn't venture out much." (Huggins Dep. at 218–19.) These sorts of "constraints" expressed by Huggins are similarly insufficient to support a finding of employee status, especially in light of all of the other factors weighing in favor of him being an independent contractor.

This testimony only establishes that the Plaintiffs generally could not use the trucks for non-CEVA purposes when the CEVA logo was displayed on the vehicle. It was, as the Plaintiffs articulate it, merely a "stringent signage requirement". (Pls. Mem. at 4.) The Plaintiffs viewed the possibility of covering up the logo as a practically impossibility; however none of the Plaintiffs seemed to seriously investigate as to whether this could be done in a reasonable fashion. More importantly, even if the reality was that it would be extremely difficult to use the truck for other types of employment, every other factor weighs clearly in favor of the Plaintiffs being independent contractors. The Plaintiffs took on this work with CEVA with the intent of being an independent contractor and reaped the benefits of that decision, with the knowledge that the trucks would be fixed with the CEVA logo. As Trevor Halls testified, this branding was beneficial to the Plaintiffs as well. When asked "Do you think the fact that you were affiliated with CEVA which was a big company with a well known brand, do you think that that contributed at all to your ability to make more money, significantly more money contracting with CEVA than you had been able to make contracting with the other three trucking companies combined?" (T. Halls Dep. 124), he responded with "Yes, I agree because CEVA is a bigger company." (Id. at 125.) Thus, they made the decision that if they wanted the work with CEVA,

they would likely forego other work opportunities with other companies. This single fact does not necessarily render them employees.

As for the other relevant factors, there is no dispute that the Plaintiffs did not receive fringe benefits and were not on CEVA's payroll. The Plaintiffs were paid as non-employees; they were compensated a fee per pick-up or delivery; and CEVA did not withhold taxes from these payments. Thus, this factor weighs in favor of a finding that the Plaintiffs are independent contractors. See, e.g., Barak, 87 A.D.3d at 957, 929 N.Y.S.2d at 318. Relatedly, the Plaintiffs all sought significant tax benefits associated with their independent contractor status in connection with CEVA, which the Court takes into serious consideration.

> Indeed, though not quite rising to the level of estoppel, if a plaintiff signs a tax return "under penalty of perjury" that declares independent contractor status and seeks "numerous deductions for business purposes associated with independent contractor status, such as travel, entertainment, lodging, supplies, telephone and depreciation of business assets," such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim.

Deboissiere v. Am. Mod. Agency, No. 09 Civ. 2316, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010) (quoting Gagen, 27 A.D.3d at 1043–44, 812 N.Y.S.2d at 690–91). This tax factor further weighs heavily in favor of independent contractor status.

Finally, the Court takes note of other circumstances that may or may not indicate whether the Defendants exerted a degree of control over the Plaintiffs, such as supervision and control over the Plaintiffs' routes.

As a general matter, even when viewing the facts in the light most favorable to the Plaintiffs, they were not supervised by CEVA or its agents. While Huggins recounted one particular incident in which a safety officer followed him on one of his deliveries, he also testified that no one else from CEVA ever oversaw his work in a supervisory manner. Cf. Connor v. Pier Sixty, LLC, 29 Misc.3d 1220, 918 N.Y.S.3d 396 (Sup. Ct., N.Y. Cnty. 2010)

("there are also a number of significant ways in which Pier Sixty did exercise such control. As the court pointed out in its original decision, Pier Sixty apparently required its temporary workers to attend a four-week training session, had supervisors present during events to offer instruction and correction to the temporary employees . . . "). The Court agrees with the Defendants that even if CEVA conducted such randomized "security" observations of the Plaintiffs, this would not alter the outcome. See In re FedEx Ground Package Sys., Inc., 734 F. Supp. 2d 557, 571, 601 (N.D. Ind. 2010) ("FedEx also hires security specialists to do random in-route van security reviews, during which they inspect drivers' vehicles to verify that drivers are securing the vehicles properly when delivering packages, e.g., the vehicle isn't left running, the bulkhead door is closed, and packages are secured. . . . the court finds that the drivers are independent contractor as a matter of law.").

The Plaintiffs also argue in their opposition that they repeatedly testified that their regular delivery routes were prepared by CEVA's dispatchers, and not by themselves as drivers. Accordingly, they contend that this control over the delivery routes demonstrates that the Plaintiffs are more properly characterized as employees. However, the Plaintiffs merely testified that with regard to their assignments, they were often given assignments in the same geographical region by the dispatchers:

> It was solely based on the dispatcher essentially. There were people who worked certain areas all the time, that's what they got up and came in to do and one of those — there was no part in the contract they signed that said this is the area you are going to work or where at any point in the contract I recall saying after a year-and-a-half or a year you will be working Suffolk solely so no, there was no contractual agreement saying that I would be working this route, but due to the dispatch giving me the work in that area consistently and a certain spot that covered a span of a certain area we considered it a route because again you go to the same spot.

(Huggins Dep. at 119.)  This testimony does not indicate that workers were given particularized routes they had to take every day or that they were actually assigned to service only a specific region.

Moreover, these geographically concentrated assignments were voluntarily taken on by the Plaintiffs in order to make more money, as demonstrated by Browning's deposition testimony:

> A: I was approached, Frank, we have this area, vendors can't do it anymore so they gave me a bunch of names of people that didn't want to do it, can you do it.
> Q. You were asked if you would be interested in doing that area?
> A. Yes.
> Q. Is that fair?
> A. Yeah.
> Q. It's fair to say you were in fact interested and because of that you started servicing that area?
> A. I did it because I wanted the money. I didn't know it would be so lucrative.

(Browning Dep. at 127.)  This is distinguishable from the 1930 case cited by the Plaintiffs in which the salesman had "no discretion as to the manner of performance, or none that [was] substantial.  He travels a prescribed route from which he may not deviate."  Glielmi v. Netherland Dairy Co., 254 N.Y. 60, 63, 171 N.E. 906 (1930).  While the Plaintiffs testified that they were typically assigned to a particular route, there is no evidence in the record that they were unable to get assignments in other geographical regions.  See DeSouza, 596 F. Supp. 2d at 465 (considering that after the plaintiff had been given an assignment, he determined his own driving routes, scheduled his own breaks, and realized a profit from his driving, which meant that the factor regarding control over the plaintiff's work weighed in favor of finding that the plaintiff was an independent contractor).  "The mere fact that the employer directs as to the things to be done without control over the methods or means of doing them does not make the contractor a

servant." N.Y. Jur. Agency § 392. Thus, "the fact that the employer gave the person employed directions with regard to the particular places at which the stipulated work was to be performed, that the employer specified the destinations to which articles were to be conveyed by a person employed for transportation work, that the employer occasionally gave instructions to the person employed to deliver goods as to whether the goods were to be delivered inside or outside, and as to whether the goods should be segregated according to type or that the employer directed the person employed to give special attention to one particular portion of the work does not affect the independence of the contract where the employer is concerned only with the result and not the means or methods employed to attain it." Id.

As for the final pieces of evidence—namely, that the Plaintiffs were required to wear uniforms; put logos on their vehicles; remain in frequent contact with the Defendants; and attend monthly meetings—these are not dispositive and do not weigh against a finding of independent contractor status as a matter of law. See DeSouza, 596 F. Supp. 2d at 464 ("Some of above-mentioned impositions mentioned by the Plaintiff, such as wearing a uniform, having a logo on his truck, or providing paperwork to the Defendant, were ancillary to his independent driving, and the imposition timetables and schedules does not strip an independent contractor of his status."); In re Empire State Towing and Recovery Ass'n, 15 N.Y.3d 433, 938 N.E.2d 984 (2010) ("Moreover, the fact that O'Connell had to submit periodic reports and attend meetings 'is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either'" (quoting Matter of Hertz Corp., 2 N.Y.3d at 735, 778 N.Y.S.2d 743, 811 N.E.2d 5)).

Overall, the Plaintiffs argue that the Defendants' motion for summary judgment should be denied because there exist questions of fact as to whether the Plaintiffs worked at their own convenience; were free to engage in other employment; and were on fixed schedules. However, the Court finds that, as a matter of law, even viewing the facts in a light most favorable to the non-movants, the Plaintiffs had significant control over their pick-up and delivery assignments for CEVA, including their daily schedule. The Plaintiffs largely had the ability to control the method, manner, and means of how they would accomplish these tasks. CEVA did have input as to a reasonable time in which to make the pick-ups and deliveries and that the deliveries would be made by a uniformed worker in a logoed truck. However, "[i]ncidental control over the results produced—without further evidence of control over the means employed to achieve the results—will not constitute substantial evidence of an employer-employee relationship." In re Hertz Corp., 2 N.Y.3d 733, 744, 778 N.Y.S.2d 743, 811 N.E.2d 5, 6 (2004). Moreover, the fact that the Plaintiffs sought tax benefits associated with independent contractor status further buttresses the Court's finding. See Gagen v. Kipany Productions, Ltd., 27 A.D.3d 1042, 812 N.Y.S.2d 689 (3rd Dep't 2006) (noting that in light of plaintiff's tax returns that reflected that he had claimed deductions associated with conducting his business as an independent contractor, summary judgment on behalf of the defendant was warranted).

Considering all the factors as a whole, a reasonable jury could only conclude that "the balance tips in favor of independent contractor status." Barnhart v. New York Life Ins. Co., 141 F.3d 1310, 1313 (9th Cir.1998). Accordingly, the Court finds that the Plaintiffs are independent contractors for purposes of the NYLL. Therefore, the Court grants Defendants' motion for summary judgment dismissing the Plaintiffs' NYLL claim.

### 4. The Plaintiffs are Independent Contractors Under the FLSA

Turning to the FSLA, the Court engages in a slightly different analysis—namely, the economic realities test. In particular, the Court assesses (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business. The Court is also free to look at any other relevant factors under the totality of the circumstances, based on the individual facts of the case. Barfield v. N.Y. City Health and Hosps. Corp., 537 F.3d 132, 141–42 (2d Cir. 2008) (explaining that a worker's status as an employee or independent contractor under the FLSA is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances . . . ."); see also Velu, 666 F. Supp. 2d at 306 ("Regardless of what factors the court chooses to consider, based on the individual facts of the case, the ultimate question is whether the putative employee is economically dependent on the putative employer.").

As set forth above, the Defendants certainly had some degree of control over CEVA's branding (i.e., the car decals and uniforms), as well as the overall safe performance of the Plaintiffs in their tasks. However, the degree of control is not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors.

It is also undisputed that the Plaintiffs had the opportunity for both profit and loss when engaging in assignments with CEVA. The Agreements did not guarantee a certain amount of work to the Plaintiffs, and some Plaintiffs testified that they operated at a loss during certain years. (See, e.g., Browning Dep. at 214 (stating that he operated at a loss in 2009).) In addition, whether the Plaintiffs made more money or less money depended largely on their investment in

bigger vehicles and hiring additional employees in order to increase their efficiency and capacity. Thus, when viewed through the prism of the economic realities test, these facts weigh in favor of a finding of independent contractor status. See Chao v. Mid-Atl. Installation Servs., Inc., 16 Fed App'x 104, 107 (4th Cir. 2001) (affirming a finding of the district court as to independent contractor status based partly on the fact that "[a]n Installer's net profit or loss depends on his skill in meeting technical specifications, thereby avoiding backcharges; on the business acumen with which the Installer makes his required capital investments in tools, equipment, and a truck; and on the Installer's decision whether to hire his own employees or to work alone.").

Of importance, the Plaintiffs made substantial investments in their businesses. They utilized their own vehicles and all of their own tools and supplies, which of course supports a finding of independent contractor status. See, e.g., Herman v. Mid-Atl. Installation Servs., Inc., 164 F. Supp. 2d 667, 675 (D. Md. 2000) ("The Installers are responsible for providing their own truck or van and specialty tools . . . Because these costs are considerable, especially considering the expense of a truck or van, and are of a type not normally borne by employees, this factor indicates that the Installers are contractors."); Nichols v. All Points Transport Corp. of Michigan, Inc., 364 F. Supp. 2d 621 (E.D. Mich. 2005) (finding that shipping company's truck drivers were "independent contractors", in part because drivers were responsible for capital investment in trucks). Cf. Herman v. Express Sixty-Minutes Delivery Service, Inc., 161 F.3d 299, 311 (5th Cir. 1998) (finding that the workers were subject to a much smaller risk of loss because they overwhelmingly did not use vehicles purchased for the purpose of becoming a driver.). In addition, they were responsible for the costs and expenses associated with the vehicle, including maintenance and repair. Thus, this factor weighs in favor of independent contractor status.

As for the next relevant factor, the Court finds that the tasks completed by the Plaintiffs did require a significant degree of skill, although the Plaintiffs attempt to minimize this as merely the ability to be a "people person". Here, the Plaintiffs needed to have professional driving skills, business management skills, knowledge of Department of Transportation regulations, and freight-handling skills. Cf. Campos v. Zoupounidis, No. 09-cv-1138, 2011 WL 2971298, at *7 (D. Conn. July 20, 2011) ("Although he needed a driver's license in order to legally drive his vehicle for deliveries, the possession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life skill' that other courts have found to be indicative of employment status rather than independent contractor status.").

Furthermore, as one Court explained the skill necessary in this type of industry:

> It is undisputed that driving a truck containing large loads of cargo requires a significant degree of skill. The job requires the skill of handling a large vehicle, detailed knowledge of the national roadways, and a high level of stamina to be able to make long trips without fatigue.

Bonnetts v. Arctic Exp., Inc., 7 F. Supp. 2d at 977, 981–82 (S.D. Ohio 1998); see also Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1262 -1263 (6th Cir. 1981) (explaining that the "company's goal of transporting its freight in a safe and efficient manner is significantly served by hiring experienced truck operators" and that "[a]n individual who possesses experience in driving large, unwieldy vehicles is obviously a more rational choice for the job than is a person who does not have demonstrated ability to drive such vehicles"). Here, all of the Plaintiffs had some relevant skills prior to their contractual relationships with CEVA. For instance, Browning had 25 years in the trucking industry before he began working with the Defendants. Two of the Plaintiffs admitted in their depositions that they did not need any training from CEVA when they began their contractual relationship because they were already experienced drivers in this field.

(See, e.g., H. Halls Dep. at 47 (discussing his prior employment and the skills he developed, including becoming familiar with "making deliveries" and "maintaining a truck"); James Dep. at 303 ("I have driving experience from years ahead. I have delivery experience years ahead before CEVA.").)

There is a substantial amount of evidence in the record to indicate the work required independent initiative. The Plaintiffs all worked varying times, making varying amounts of money, depending largely upon how early in the day they arrived to receive the most lucrative assignments and the scale of their own small businesses.

Therefore, the degree of skill and independent initiative weigh in favor of a finding of independent contractor under the relevant FLSA analysis.

Next, the Court explores the duration of the working relationship. Although it is not dispositive, the Court looks to the express terms of the contract between the Plaintiffs and CEVA. The Agreements stated that the Plaintiffs agreed "to direct the operation of the Leased Vehicle and to determine the method, manner and means of performing the contractual obligations under [the] Agreement in all respects including, but not limited to, such matters as the rejection and acceptance of dispatches offered by [CEVA]; the days and time [the Plaintiffs] will operate the Leased Vehicle; the routes traveled; parking sites, and the repair of the Leased Vehicle, provided that [the Plaintiffs] fully and efficiently perform[ed] its obligations under [the] Agreement." (Id.)

By its terms, the Agreements between the Plaintiffs and the Defendants last for a period of one year, which would be continued for successive one year terms unless terminated by either party on 30-days written notice. In addition, the terms of the Agreements make clear that the contractual relationship between the Plaintiffs and CEVA was terminable at any time by either

party.  This does not suggest a permanent relationship.  See Johnson v. City of Saline, 151 F.3d

564, 568-69 (6th Cir. 1998) ("[T]he contractual relationship reads unmistakably as one with an

independent contractor as opposed to one with an employee.");  Bonnetts, 7 F. Supp. 2d at 981

(determining that relationship between parties "was not one of a permanent nature, and therefore,

indicative of an independent contractor relationship.").  Thus, the Plaintiffs' attempt to cast this

relationship as "permanent" is unavailing.

As for the next relevant factor, the Court does find that the Plaintiffs' services were

integral to CEVA.  However, CEVA also provided other services in its business, including what

it calls "supply chain management", logistics, and transportation services.  However, even if

considered integral, the Plaintiffs were easily replaceable.  See Velu, 666 F. Supp. 2d at 307–08

("Plaintiff's work is an integral part of Defendant's business model, but his work is

interchangeable with the work of other drivers; when he refuses work, other drivers fill in.").

Therefore, while the Plaintiffs' work was integral to CEVA, this factor only weighs slightly in

favor of finding that the Plaintiffs should qualify as employees under the FLSA, and would not

prevent this Court from finding, as a matter of law, that the Plaintiffs are independent

contractors.  See Nichols, 364 F. Supp. 2d at 634 ("Defendant does not dispute that the drivers

constitute an integral part of its business.  On balance, however, the six factors demonstrate that

the drivers are independent contractors.").

In sum, when looking at "whether, as a matter of economic reality, the workers depend

upon someone else's business for the opportunity to render service or are in business for

themselves", it appears abundantly clear to the Court that the Plaintiffs were in business for

themselves.  Godoy v. Rest. Opportunity Ctr. of N.Y., Inc., 615 F. Supp. 2d 186, 192–93

(S.D.N.Y. 2009) (internal citations omitted).  In Velu, the court explained that "if either party

were to terminate the Agreement today, Plaintiff could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company." Here, an analogous result is found. If either party were to terminate the Agreement, the Plaintiffs could essentially go out the next day with their trucks and equipment and immediately work for another shipping company. The Court agrees with the Defendants that the Plaintiffs were essentially small businessmen who owned their trucks; hired their own helpers; and had responsibility for their own investment and management.

Accordingly, the Court finds that the Plaintiffs are independent contractors for purposes of the FLSA. See McGuiggan v. CPC Intern., Inc., 84 F. Supp. 2d 470, 479 (S.D.N.Y. 2000) ("In short, if the Plaintiffs were in business for themselves, they were not employees"). Therefore, the Court grants the Defendants' motion for summary judgment dismissing the Plaintiffs' FLSA claim. See Kirsch, 148 F.3d at 171 (finding that the trial record was ample to permit a decision maker to conclude, in light of the totality of the circumstances, that Kirsch was an independent contractor because he "was not required to spend time in the company's offices; was free to set his own schedule and take vacations when he wished; did not have the company withhold income or Social Security taxes; did not receive employee benefits such as health insurance; was not reimbursed for his expenses; was allowed to sell merchandise on behalf of other companies; and described himself as 'independently employed.'").

### III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Defendants' motion for summary judgment is granted in its entirety, dismissing the Complaint as to all causes of action; and it is further

**ORDERED** that the Clerk of the Court is directed to mark this case as closed.

**SO ORDERED.**

Dated: Central Islip, New York
August 11, 2012

                                                  _____*/s/ Arthur D. Spatt*_____
                                                   ARTHUR D. SPATT
                                         United States District Judge